**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| VERONICA LYNCH, individually and on behalf of all others similarly situated and on behalf of the Hospira 401(k) Retirement Savings Plan, | No. |
| Plaintiff, | |
| -against- | |
| HOSPIRA, INC., THE EMPLOYEE BENEFIT BOARD OF REVIEW OF HOSPIRA, INC., PAMELA HANNON, HENRY A. WEISHAAR, LORI O. CARLSON, RICHARD J. HOFFMAN, THE COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS OF HOSPIRA, INC., ROGER W. HALE, CONNIE R. CURRAN, JACQUE J. SOKOLOV, and HEINO VON PRONDZYNSKI, | |
| Defendants. | |

**CLASS ACTION AND DIRECT ACTION COMPLAINT FOR VIOLATIONS
OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA")**

Plaintiff Veronica Lynch ("Plaintiff"), individually and on behalf of a class of similarly situated participants in and beneficiaries of the Hospira 401(k) Retirement Savings Plan (the "Plan"), as well as on behalf of the Plan, alleges the following based upon the investigation of counsel, and upon personal knowledge as to facts pertaining to Plaintiff and on information and belief as to all other facts:

## NATURE OF THE ACTION

1.     This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132, against the Plan's fiduciaries, who are and were responsible for the administration of the Plan and the investment of the Plan's assets between April 12, 2010 through and including the present (the "Class Period"). During the Class Period, the Plan's fiduciaries breached their fiduciary duties owed to the Plan's participants and beneficiaries (collectively, the "Participants"), causing the loss of millions of dollars of Participants' retirement savings.

2.     Alternatively, this action is brought as a direct action brought individually and on behalf of the Plan, pursuant to ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the Plan's fiduciaries.

3.     Hospira, Inc. ("Hospira") is a global specialty pharmaceutical and medication delivery company that develops, manufactures, and markets medical drugs and products aimed at improving the safety and productivity of patient care and medication management.  Hospira's customers include hospitals and alternate healthcare providers, such as clinics, home healthcare providers, and long-term care facilities.

4.     Beginning on April 12, 2010, and continuing throughout the Class Period, defendants knew or should have known that Hospira was experiencing a myriad of product and quality control problems and manufacturing delays and an inability to bring its manufacturing facilities into regulatory compliance.  Defendants knew or should have known that Hospira was experiencing safety issues with its drug product Symbiq causing Hospira to recall and place a hold on further shipments of Symbiq.  Defendants also knew or should have known that Hospira had received numerous "Warning Letters" and "Form FDA-483s" from the U.S. Food and Drug

2

Administration ("FDA") identifying reoccurring quality control and manufacturing deficiencies and regulatory violations at several of Hospira's key manufacturing facilities. Defendants knew or should have known that Hospira's recall and hold of Symbiq products and its FDA regulatory compliance problems would have a severe adverse impact on the Hospira's financial results, growth potential, and shareholder value, thereby making the Plan's continued investment in Hospira common stock imprudent.

5.      Defendants, as fiduciaries of the Plan, charged with overseeing the prudent investment and management of the Hospira Stock Fund in the Plan, should have taken action to protect the Plan's investments once defendants knew or should have known about Hospira's quality control and manufacturing deficiencies and regulatory compliance problems. Yet, throughout the Class Period, defendants continued to allow the Plan to invest heavily in Hospira common stock and failed to take *any* action to protect the Plan or its Participants from suffering heavy losses as a result of the Plan's investment in Hospira common stock. In fact, in individual investment account statements sent to Plan Participants, Hospira encouraged Participants to "put even more into your 401(k) account" and to invest "as much as you can" into the Plan "regardless of what the market and economy do."

6.      Plaintiff's claims arise from the failure of defendants, who are fiduciaries of the Plan, to act solely in the interest of the Plan's Participants, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

7.      As a result of the defendants' breaches of their fiduciary duties, Plaintiff and the other members of the Class have suffered substantial losses of retirement savings and anticipated retirement income from their investment in the Plan. As such, under ERISA, defendants are

3

obligated to restore to the Plan the losses that resulted from their breaches of their fiduciary duties pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from defendants, including, without limitation, injunctive relief, constructive trust, restitution, and other monetary relief.

## JURISDICTION AND VENUE

8.    This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

9.    ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the defendants are residents of the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of Illinois.

10.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and/or some of the defendants reside or maintain their primary place of business in this District.

## THE PLAN

11.     The Plan is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

12.     The Plan is a "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34), in that separate individual Plan accounts are maintained for each participant based upon the amount contributed to each participant's account.

13.     Employees are eligible to participate in the Plan if they work 20 or more hours per week and Hospira treats them as an "employee" for purposes of employment taxes and wage withholding for federal income taxes.  Employees are automatically enrolled in the Plan at a pretax contribution rate of 5% of eligible compensation unless the employee chooses to "opt out" of the Plan or elects to contribute at a contribution percentage other than the automatic 5%. Participants may contribute between 2% and 25% of their eligible compensation on a pre-tax, after-tax, or combination basis.

14.     According to the Plan's Statement of Investment Policy, adopted October 31, 2005 and amended February 8, 2012, "the primary objective of the Plan is to provide a benefit to employees, which encourages [Plan participants] to save for retirement by providing a tax-deferred savings vehicle."

15.     The Plan offers a variety of investments and mutual funds for Participants, one of which is the Hospira Company Stock Fund which invests exclusively in Hospira common stock. The Plan does not limit the number of shares of Hospira common stock that may be issued under the Plan.  Indeed, according to the "Investment Objective" of the Plan identified within the Plan's Welcome Guide disseminated to Plan Participants, "[t]he [Plan] offers you an opportunity to invest your retirement savings in Hospira, Inc. common stock.  The fund is ***invested to the***

*maximum extent possible in the common stock* of the company." (Emphasis added). According to the Plan's Statement of Investment Policy, the Plan offers Hospira common stock for investment in order to "provide an opportunity for Participants to share in Hospira's future growth."

16.     Notably, the Plan "permits, but does not require" Hospira common stock to be held as an investment option in the Plan.

17.     According to Hospira's Form 5500 filed with the Department of Labor and the Department of the Treasury for the calendar plan year 2010 (the "Form 5500"), as of December 31, 2010, there were 9,134 total Participants either receiving or entitled to receive benefits under the Plan.

18.     According to the Form 5500, the Plan is administered from its corporate headquarters located at 275 N. Field Dr., Lake Forest, Illinois 60045.

19.     The Plan is a legal entity which can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l). However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan. Stated differently, Plaintiff seeks relief on behalf of the Plan.

## PARTIES

**Plaintiff**

20.     Veronica Lynch is a resident of the State of Illinois and is and was at all relevant times a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Among other available options under the Plan, Plaintiff Lynch held Hospira common stock in her Plan account.

6

**Hospira**

21.     Hospira is a Delaware corporation with its headquarters located at 275 N. Field Dr., Lake Forest, Illinois 60045.  Founded in 2003, Hospira is a pharmaceutical and medication provider of over 200 types of injectable generic drugs and infusion technologies, owning approximately 37% of the worldwide generic injectables market.    Hospira develops, manufactures, and markets a broad range of pharmaceutical and medical drugs to help improve the safety, wellness, and productivity of patient care.  In addition, Hospira offers medication management products comprising of infusion pumps and dedicated administration sets, MedNet safety software system and related services, software applications and devices that support point-of-care medication administration, gravity administration sets, and other device products. Hospira conducts its operations worldwide and is managed in three reportable segments:  the Americas; the Europe, Middle East and Africa regions; and the Asia Pacific region.

22.     One of the types of products and services provided by Hospira is called "medication management," which includes electronic drug delivery pumps designed to deliver I.V. fluids and medications to patients.  These drug delivery pump products include Hospira's general infusion pump known as Symbiq.  As detailed below, on April 27, 2010, Hospira placed a voluntary hold on all shipments of Symbiq to customers after Hospira received an unexplained increase in customer complaints related to failures of the Symbiq device to work properly and safely.

23.     As of December 31, 2011, Hospira operated 12 manufacturing facilities globally. Hospira's largest facilities are located in Rocky Mount, North Carolina; Austin, Texas; and McPherson, Kansas, and account for a significant portion of Hospira's manufacturing output.

24.     Hospira's Rocky Mount manufacturing facility produces generic injectables and large-volume solutions and accounts for approximately 25% of Hospira's net sales.  During a 2011 investor presentation, Hospira referred to Rocky Mount as having been "the crown jewel of Hospira and [the] hospital product division for many years."

25.     As detailed below, on April 12, 2010, the FDA issued Hospira a "Warning Letter"[1] identifying manufacturing practice deficiencies and quality assurance and compliance violations found in the Rocky Mount facility.  The FDA conducted follow-up inspections of Rocky Mount in January, June, and August of 2011 to evaluate Hospira's corrective actions taken in response to the violations identified in the April 12 Warning Letter.  The June and August inspections led the FDA to issue Hospira additional Form FDA-483s ("Form 483")[2] identifying observed facility and product quality control concerns and areas requiring remediation.

26.     Hospira's Austin, Texas manufacturing facility produces large-volume solutions and premixes and accounts for approximately 11% of Hospira's net sales.

27.     As detailed below, the FDA conducted an inspection of Hospira's Austin, Texas facility in April 2001 leading the FDA to issue a Form 483 on April 27, 2011, observing facility and product quality control concerns and areas requiring remediation.

---

[1]     A Warning Letter is a correspondence that notifies regulated individuals and firms about violations that the FDA has documented during its inspections or investigations.  Typically, a Warning Letter notifies an individual or firm that the FDA considers one or more products, practices, processes, or other activities to be in violation of the Federal Food, Drug, and Cosmetic Act, its implementing regulations, and/or other federal statutes.  According to the FDA's Regulatory Procedures Manual, Chapter 4-1-1, the FDA's "position is that *Warning Letters are issued only for violations of regulatory significance.  Significant violations are those violations that may lead to enforcement action if not promptly and adequately corrected.*  A Warning Letter is the agency's principal means of achieving prompt voluntary compliance with the Federal Food, Drug, and Cosmetic Act (the Act)."  (Emphasis added).

[2]     A Form 483 is a form used by the FDA to document and communicate regulatory compliance concerns and observations discovered during an inspection of facilities.  When a Form 483 is issued, the recipient has within 15 business days to respond to the Form 483, addressing each specific concern and observation recorded.

28.     Hospira's McPherson, Kansas manufacturing facility produces generic injectables, differentiated delivery systems, and contract manufacturing services, and accounts for approximately 12% of Hospira's net sales.

29.     As detailed below, on January 4, 2012, the FDA issued a Form 483 for Hospira's McPherson, Kansas facility, observing facility and product quality control concerns and areas requiring remediation.

30.     During the Class Period, Hospira common stock traded on the New York Stock Exchange under the symbol "HSP."  As of March 14, 2011, Hospira had 167,255,697 shares of common stock issued and outstanding.

**The Board of Review**

31.     According to its Charter (amended effective as of March 3, 2009), the Employee Benefit Board of Review of Hospira ("Board of Review") is responsible for administering all powers, duties and obligations which are lodged in Hospira under the Plan.  Notably, according to the Plan's Statement of Investment Policy,[3] the Board of Review is "responsible for selecting the investment funds to be offered under the Plan" and responsible for regularly reviewing and evaluating the investment funds offered by the Plan.  This review takes into account a broad range of factors, including performance, fund management and the mix of options offered under the Plan that allows participants to diversify investments.  The Board of Review has the discretion to change or remove an investment option in the Plan.

32.     The Board of Review's additional functions include, among others, adopting Plan amendments, appointing and removing Plan trustees, investment managers, and members of other Plan committees, make rulings, interpretations in the administration of the Plan,

---

[3]     The Board of Review established its Investment Policy "for the purpose of providing general investment guidelines to govern the management of Plan assets."

determining the amount of employer contributions to be made to the Plan, and act as the "Retirement Plans Investment Board" for the Plan.

33. The Board of Review shall consist of three or more members appointed by the Compensation Committee of the Board of Directors of Hospira (the "Compensation Committee"). One member of the Board of Review shall consist of Hospira's Vice President, Total Rewards & Employee Services, who is also designated as the Plan Administrator. At the Compensation Committee's discretion, it may appoint one member of the Board of Review to act as chairman of the Board of Review.

34. Pamela Hannon ("Hannon") served as Hospira's Vice President, Total Rewards & Employee Services, and as such, served as a member of the Board of Review and as Administrator of the Plan during the Class Period. The Form 5500 also identifies Defendant Hannon as the Plan Administrator.

35. Henry A. Weishaar ("Weishaar") served as a member of the Board of Review during the Class Period. Defendant Weishaar signed the Amendment and Restatement of the Hospira 401(k) Retirement Savings Trust Agreement, dated June 2007, to execute the Trust Agreement in a representative capacity on behalf of the Board of Review.

36. Lori O. Carlson ("Carlson") served as a member of the Board of Review during the Class Period.

37. Richard J. Hoffman ("Hoffman") served as a member of the Board of Review during the Class Period.

38. Hannon, Weishaar, Carlson, and Hoffman are collectively referenced herein as the "Board of Review Defendants."

10

**The Compensation Committee**

39.     Compensation Committee is responsible for, among other things, appointing, monitoring, and when necessary removing members of the Board of Review and reviewing and recommending to Hospira's Board of Directors (the "Board") policies, practices, and procedures relating to the administration of the Plan.  The Board of Review shall report to the Compensation Committee such as items as the Board of Review shall determine or as the Compensation Committee may request.

40.     Roger W. Hale ("Hale") has served as a director on the Board since October 2006 and as Chair of the Compensation Committee during the Class Period.

41.     Connie R. Curran ("Curran") has served as a director on the Board since 2004 and as a member of the Compensation Committee during the Class Period.

42.     Jacque J. Sokolov ("Sokolov") has served as a director on the Board since 2004 and as a member of the Compensation Committee during the Class Period.

43.     Heino von Prondzynski ("Prondzynski") has served as a director on the Board since March 2009 and as a member of the Compensation Committee during the Class Period.

44.     Hale, Curran, Sokolov, and Prondzynski are collectively referenced herein as the "Compensation Committee Defendants."

## DEFENDANTS WERE FIDUCIARIES OF THE PLAN

45.     During the Class Period, all of the defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section because each defendant had the "authority to control and manage the operation and administration" of the Plan, ERISA § 402(A)(1), 29 U.S.C. § 1102(a)(1), and each defendant had

discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

**Fiduciary Status of Hospira**

46.     Hospira was a named fiduciary under the Plan within the meaning of ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) in that Hospira is named as the Plan's Sponsor.

47.     Hospira was also a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because Hospira, through its officers, directors, and/or committee members, exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  Hospira also exercised discretionary authority with respect to the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility.

48.     Hospira was a fiduciary to the extent that the Board and/or its employees served on the Board of Review and/or Compensation Committee.  The Board of Review Defendants and Compensation Committee Defendants were officers and other employees of Hospira.  Based on these facts, Hospira had control over the actions of the Board of Review, the Compensation Committee, and their members, and is liable for the actions of those Committees and individuals.

49.     Throughout the Class Period, Hospira had, at all applicable times, effective control over the activities of its directors, officers, and employees, including over their activities related to the Plan.  Through the Board or otherwise, Hospira had the authority and discretion to hire and terminate said officers and employees.  In addition, upon information and belief, Hospira had the authority and discretion to appoint, monitor, and remove individual directors, officers, and employees from their individual fiduciary roles with respect to the Plan. Accordingly, the actions of the Board of Review, Compensation Committee, and their members,

and/or any other employee fiduciaries of the Plan are imputed to Hospira under the doctrine of *respondeat superior* and Hospira is liable for these actions.

50.     In addition, Hospira acted as a fiduciary of the Plan in connection with the dissemination of Plan communications to the Plan's Participants.   Hospira made direct representations to Participants relating specifically to the Plan's investment options, the business and financial condition of Hospira, and the risks and prudence of investing the Plan's assets in Hospira common stock, and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

51.     Hospira was responsible for disseminating a Summary Plan Description ("SPD") for the Plan to Participants and a Summary of Plan Investment Options for the Plan ("Investment Summary"), which purports to describe the investment characteristics of the Plan's investment options.   The SPD and Investment Summary, and all information contained or incorporated therein, constitute representations disseminated in a fiduciary capacity upon which Participants were entitled to rely in making decisions concerning their benefits and the investment and management of the Plan's assets allocated to their accounts.   Hospira exercised discretion over the contents of each SPD, Investment Summary, and Benefits Guide it disseminated to Participants, which were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

**Fiduciary Status of the Board of Review**

52.     Defendant Board of Review was a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  Members of the Board of Review were also fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority and control regarding the administration and management of the Plan

and/or the investment of the Plan's assets, and possessed the full authority in their discretion to determine all investment-related questions with respect to the Plan.

53.     Throughout the Class Period, the Board of Review exercised discretionary authority and control in selecting, evaluating, monitoring, and altering the makeup of the investment alternatives available under the Plan. The Board of Review had the discretionary responsibility to regularly review and evaluate the investment funds offered by the Plan and, when necessary and prudent to do so, to change or remove investment options available in the Plan. Indeed, as the Statement of Investment Policy directs, "[i]t is the responsibility of the Board of Review to ensure that the Plan offers suitable range of prudent investment choices."

54.     According to the Plan's Statement of Investment Policy, the Board of Review must perform its fiduciary duties with respect to the Plan "solely in the interest of the Plan's participants and beneficiaries." These duties include the following, among others:

- Evaluate fund managers and investment performance;
- Develop, review, and revise the Plan's Statement of Investment Policy;
- Monitor recordkeeping and investment fees; and
- Determine the appointment/discharge of investment managers and consultants.

55.     Furthermore, the Board of Review had the discretionary authority to appoint an independent fiduciary to monitor and ascertain the ongoing suitability of Hospira stock under the Plan. The Board of Review also had the discretionary authority to retain the services of one or more investment managers as defined in ERISA § 3(38), 29 U.S.C. 1002(38), to assume all of part of the Board of Review's duties under the Plan's Statement of Investment Policy. The Board of Review also had the discretionary authority to retain the services of a third party investment consultant to monitor the performance of the Hospira 401(k) Retirement Savings Trust, which funds the Plan, and the performance of the individual investment managers.

14

56.     Importantly, the Board of Review had the discretionary authority and responsibility to regularly review and evaluate the performance of each investment fund of the Plan.  In addition, to the extent that the Board of Review has appointed investment managers, the Board of Review had the discretionary authority and responsibility to review the performance of such investment managers, including among other things, adherence to investment guidelines, relative results as compared with a universe of like investment managers, and new opportunities available in the market place.

57.     Should an appointed investment manager fail to properly and prudently manage and oversee the  Plan's investments, the Board of Review has the discretionary authority and responsibility to remove the investment manager from his or her appointed position.  Criteria for such removal, include but are not limited to, underperformance of the Plan's investments, poor or inconsistent risk management, significant or intentional breach of mandate or directive, and loss of confidence by the Board of Review in the investment manager.

58.     Defendant Hannon is also a fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(2l)(A), in that Defendant Hannon signed the Form 5500 as the individual signing as the Plan's Administrator.  Defendant Hannon possessed administrative and fiduciary authority and responsibilities over the Plan and its assets, including among things, to make and enforce such rules and regulations proper or necessary to ensure the efficient administration of the Plan.  Defendant Hannon also communicated to Plan Participants through letters directed to Plan Participants within Hospira's annual Benefits Guides sent to all Plan Participants.

**Fiduciary Status of the Compensation Committee**

59.     Members of the Compensation Committee were fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority

15

and control with respect to: (i) managing and administering the Plan; and/or (ii) managing and disposing of the Plan's assets.

60.     The Compensation Committee exercised discretionary authority over the appointment of members of the Board of Review, and the continued monitoring of their performance, and when necessary, over the removal and replacement of members of the Board of Review.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

61.     During the Class Period, Hospira and the Board of Review Defendants made direct and indirect communications with Participants, which included statements regarding investments in the Hospira Stock Fund and Hospira common stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, Plan documents (including SPDs, Investment Summaries, and Benefits Guides regarding the investment characteristics of the Plan's investment options), and  Participants' investment account statements, which incorporated and/or reiterated these statements.  These communications were acts of the Plan's administration and the Board of Review Defendants acted as fiduciaries to the extent that they engaged in this activity.

62.     Hospira and the Board of Review Defendants communicated material information necessary for Participants to make informed decisions with respect to the investment of Hospira stock in the Plan and, in an attempt to comply with ERISA § 404(a)(1)(A) and (B), the Board of Review Defendants referenced and incorporated SEC filings into Plan documents and other fiduciary communications intended to convey information related to the Plan and its investment options to Participants.

16

**All Defendants Were Co-Fiduciaries**

63.     Each defendant is co-fiduciary of the other defendants under ERISA § 405, 29 U.S.C. § 1105.

## DEFENDANTS' FIDUCIARY DUTIES

**The Duty of Prudence**

64.     ERISA § 404(1)(a)(B) imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims …."

**The Duty of Loyalty**

65.     ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries."

66.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye-single" to the interests of the participants and beneficiaries, regardless of any other interests, including those of the fiduciaries themselves or the plan's sponsor.

**The Duty to Disclose and Inform**

67.     The duties of loyalty and prudence include the duty to disclose and inform.  These duties entail: (i) a duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and

accurate information material to the circumstances of participants and beneficiaries. These duties recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

68. Pursuant to the duty to disclose and inform, at all relevant times, plan fiduciaries are required under ERISA to furnish certain information to plan participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires the plan's administrator to furnish an SPD to participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD and all information contained or incorporated in it constitutes representations in a fiduciary capacity upon which Participants are entitled to rely in determining the identity and responsibilities of fiduciaries under the plan and in making decisions concerning their benefits and the investment and management of the plan's assets allocated to their accounts.

**The Duty to Monitor Appointed Fiduciaries**

69. Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries who are appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.

**The Duty to Investigate and Monitor Investment Alternatives**

70. The duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to continually monitor, the merits of the investment alternatives in the plan, including employer stock, to ensure that each investment is a suitable option for the plan.

**The Duty to Disregard Plan Documents When Necessary**

71. A fiduciary may not avoid their fiduciary responsibilities by relying solely on the language of the plan's documents. While the basic structure of a plan may be specified, within

limits, by the plan's sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

## CLASS ACTION ALLEGATIONS

72. Plaintiff brings this action as a class action pursuant to Rule 23(a), (b)(1)(B), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between April 12, 2010 through and including the present, and whose accounts held Hospira common stock or units in the Hospira Stock Fund, and were damaged thereby.

73. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, but can be ascertained readily through appropriate discovery, upon information and belief there are at least thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period. As of December 31, 2010, there were 9,134 total Participants either receiving or entitled to receive benefits under the Plan.

74. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)   whether defendants each owed a fiduciary duty to Plaintiff and members of the Class;
>
> (b)   whether defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants;
>
> (c)   whether defendants violated ERISA; and

(d)     whether Plaintiff and members of the Class have sustained damages and, if so, what is the appropriate measure thereof.

75.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained a diminution of vested benefits arising out of defendants' wrongful conduct in violation of ERISA as complained of herein.

76.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

77.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class or parties to the actions, or substantially impair or impede their ability to protect their interests.

78.     Class action status is also warranted under 23(b)(2) because defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

79.     Class action status is additionally warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DIRECT ACTION ON BEHALF OF THE PLAN

80.     In the alternative to bringing this action as a class action brought on behalf of a class of Plan Participants, Plaintiff, as a participant in the Plan, bring this action directly on behalf of the Plan, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), seeking all relief to which the Plan is entitled for the breaches of fiduciary duty set forth herein.  ERISA § 502(a) expressly authorizes any plan participant to bring an action against a fiduciary who has violated ERISA § 409.

## FACTUAL BASIS OF DEFENDANTS' FIDUCIARY BREACHES

81.     Prior to April 12, 2010, Hospira had experienced strong financial growth, marked by higher sales volume, and improved manufacturing efficiency.  In 2009 and early 2010, Hospira touted its increased sales volume, and improved manufacturing efficiency and confidently proclaimed that it was well-positioned for sustainable, long-term growth and increased shareholder value.

82.     On October 27, 2009, Hospira issued a press release entitled "Hospira Reports third-Quarter 2009 Results – Affirms recently increased 2009 sales projections and increases earnings guidance," reporting that

> "Hospira delivered strong results in the third quarter, aided by the launch of the generic oncolytic oxaliplatin and additional progress toward our Project Fuel initiatives," said Christopher B. Begley, chairman and chief executive officer.  "***We continued to position Hospira for future success in this milestone quarter, during which we surpassed the billion dollar revenue mark for the first time and generated strong double-digit earnings per share growth.*** We remain confident in our projections for full-year sales and are increasing our earnings per share guidance."

(Emphasis added).

83.     That press release further reported that "[n]et sales increased 8.9 percent to $1.0

21

billion in the third quarter of 2009, compared to $926 million in the third quarter of 2008" and that "[a]djusted* income from operations increased 28.3 percent to $207 million in the third quarter of 2009, compared to $162 million in the third quarter of 2008.  Driving the majority of the increase were ***higher sales volumes and increased manufacturing efficiency.***" (Emphasis added).

84.     On February 4, 2010, Hospira issued a press release, entitled "Hospira Reports Fourth-Quarter and Full-Year 2009 Results – Provides Sales and Earnings Projections for 2010," announcing Hospira's financial results for the fourth quarter and full-year 2009. The press release announced, in pertinent part:

> "***Driven by double-digit revenue and adjusted earnings growth, the fourth quarter concluded a year of transformation for Hospira***.  ***In addition to our strong financial performance, we made significant progress on many fronts***, including augmenting our biogenerics program, launching a generic version of a blockbuster oncology drug, and advancing Project Fuel, our corporate-wide optimization initiative," said Christopher B. Begley, chairman and chief executive officer.  "Looking forward, ***we expect 2010 to be another good year of growth*** for Hospira. Backed by our commitment to strong execution and focus on sustained operational improvement, ***we continue to position Hospira for sustainable, long-term growth and increased shareholder value***."

> * * *

> ***Adjusted* income from operations increased*** 8.5 percent to $204 million in the fourth quarter of 2009, compared to $188 million in the fourth quarter of 2008.  Driving the majority of the increase were ***higher net sales***, more favorable product mix and improvements resulting from the company's Project Fuel optimization initiatives.

> * * *

> "***The significant momentum we generated in 2009 has paved the way for continued progress in 2010***,"said Begley. "With our robust product pipeline, anticipated advancements in both Specialty Injectable Pharmaceuticals and Medication Management

Systems, combined with our focus on operational optimization through Project Fuel, ***Hospira is on track for another good year.***"

(Emphasis added).

85.     On February 18, 2010, Hospira filed its Annual Report for the year 2009 with the SEC on Form 10-K.   The Form 10-K announced that Hospira's gross profit increased $113.7 million, or 8.5%, in 2009, compared to 2008 and attributed that increase to "higher production volume and cost reductions associated with Project Fuel and Facilities Optimization initiatives contributed to manufacturing efficiency gains."

86.     On April 12, 2010, Hospira common stock reached a daily trading high of $56.38 per share.   However, April 12, 2010 marked the beginning of continuously mounting quality control and manufacturing problems for Hospira and an inability to bring its key manufacturing facilities into regulatory compliance.

87.     On April 16, 2010, Hospira filed a Form 8-K with the SEC announcing that on April 13, 2010 it had received a Warning Letter from the FDA, dated April 12, 2010, "in connection with the FDA's inspection of [Hospira's] pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina."   According to the Form 8-K:

> In the warning letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture the Company's products at the Rocky Mount facility.  The letter also asserts other inadequacies, including the Company's procedures related to the Quality Control unit, investigations, and medical device reporting obligations.  The letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar violation cited in an August 12, 2009 warning letter to the Company's Morgan Hill, California facility.

23

88.     The April 12, 2010 Warning Letter identified numerous "significant violations of Current Good Manufacturing Practice (CGMP) regulations" observed during the FDA's January 12-19, 2010 and January 26-February 23, 2010 inspections of Hospira's Rocky Mount and Clayton facilities.  With respect to the CGMP violations observed by the FDA at both facilities, the Warning Letter stated, in pertinent part:

> A.  Clayton facility
>
> 1.  Your firm does not have adequate written procedures for production and process controls designed to assure that the drug products you manufacture have the identify, strength, quality, and purity they purport or are represented to possess.
>
> For example, your firm failed to assure adequate process design and control of Liposyn, Propofol and Cleviprex emulsion products to prevent objectionable particulate contamination (primarily stainless steel).  Such controls would include, but are not limited, to appropriate component controls, equipment suitability, equipment maintenance, and filtration.
>
> This particulate contamination problem has been a persistent and serious issue at your firm for multiple years.
>
> * * *
>
> Your failure to follow written procedures, assure prompt investigation, determine root cause, and implement appropriate corrective action resulted in exposure of patients to objectionably contaminated drugs.our failure to follow written procedures, assure prompt investigation, determine root cause, and implement appropriate corrective action resulted in exposure of patients to objectionably contaminated drugs.
>
> This is a repeat observation from the April 2009 inspection.
>
> * * *
>
> 2.  Your firm has failed to ensure the responsibilities and procedures applicable to your quality control unit are in writing and are followed.
>
> For example, your Quality Control Unit (QCD) failed to: (1) ensure that the manufacturing processes for your Liposyn,

24

Propofol, and Cleviprex drug products are adequately designed, controlled, and monitored; (2) implement adequate corrective and preventive actions related to objectionable particulate contamination in Liposyn, Propofol, and Cleviprex drug products; and (3) complete and approve 178 manufacturing investigations within 30 days and issue NDA Field Alert Reports (FAR) in a timely manner.

This is a repeat observation from the April 2009 inspection.

3. Your firm has not thoroughly investigated the failure of a batch or any of its components to meet its specifications, whether or not the batch has already been distributed, or extend investigations to other batches of drug product that may have been associated with the specific failure or discrepancy

For example, you failed to conduct adequate investigations that result in your implementation of corrective actions to prevent recurrence of the problems and evaluate other potentially affected lots. Specifically, particulates were identified during an inspection of retain samples for two partially distributed lots of Liposyn on January 21, 2010.

This is a repeat observation from the April 2009 inspection.

4. Your firm has not established acceptance criteria for the sampling and testing conducted by the quality control unit to assure that the batches of drug products meet each appropriate specification and appropriate statistical quality control criteria as a condition for their approval and release.

\* \* \*

5. Your firm has not established scientifically sound and appropriate sampling plans designed to assure that drug products conform to appropriate standards of identity, strength, quality, and purity.

This is a repeat observation from the April 2009 inspection.

B. Rocky Mount facility

1. Your firm does not have adequate written procedures for production and process controls designed to assure that the drug products you manufacture have the identity, strength, quality, and purity they purport or are represented to possess.

89.     With respect to quality system and medical device reporting violations observed

by the FDA at both facilities, the Warning Letter stated, in pertinent part:

> Clayton facility
>
> 1.  Failure to adequately validate with a high degree of assurance, and approve according to established procedures, the results of a process that cannot be fully verified by subsequent inspection and test.
>
> * * *
>
> B. Rocky Mount facility
>
> 1.  Failure to adequately validate with a high degree of assurance, and approve according to established procedures, the results of a process that cannot be fully verified by subsequent inspection and test.
>
> * * *
>
> 2.  Failure to submit adverse events reports.

90.     The Warning Letter further advised Hospira:

> The violations cited in this letter are not intended to be an all inclusive list of violations that may exist at your facilities. ***You are responsible for investigating and determining the causes of the violations identified above and for preventing their recurrence and the occurrence of other violations. It is your responsibility to assure compliance with all requirements of federal law and FDA regulations.***
>
> ***You should take prompt action to correct the violations cited in this letter.*** Failure to promptly correct these violations may result in legal action without further notice including, without limitation, seizure and injunction. Other federal agencies may take this Warning Letter into account when considering the award of contracts. Additionally, FDA may withhold approval of requests for export certificates, or approval of new drug applications listing your facilities, until the above violations are corrected. Furthermore, premarket approval applications for Class lll devices to which the Quality System regulation violations are reasonably

26

related will not be approved until the violations in this letter have been corrected.

* * *

Finally, we note that the CGMP violations listed in this letter include a similar violation (failure to identify actions needed to correct and prevent the recurrence of defective product) to the violation cited in the August 12, 2009 Warning Letter to Hospira's Morgan Hill, California facility. *It is apparent that Hospira's attempts to implement global corrective actions after past regulatory actions by the FDA have been inadequate. Be advised that corporate management has the responsibility to ensure the quality, safety, and integrity of its drug products and devices. FDA expects that your corporate management will immediately undertake a comprehensive evaluation of global manufacturing operations to ensure compliance with CGMP and QS regulations where applicable.*

(Emphasis added).

91.    As a February 7, 2012 news article entitled "BlackRock's Top Underperforming Sells" observed, "[Hospira's] market share has seen a steady decline ever since it received the warning letter to its Clayton and Rocky Mouint facilities by [the] FDA."

92.    On April 27, 2010, Hospira filed a Form 10-Q with the SEC announcing Hospira's financial results for the first quarter 2010. The Form 10-Q announced that:

In April 2010, Hospira placed a voluntary hold on all shipments of Symbiq$^{TM}$ pumps, a large volume infusion device, to new customers. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq$^{TM}$ pump to alarm at the end of infusion therapy under certain use conditions. Hospira cannot predict when it will lift this voluntary hold and is developing a comprehensive action plan to address this issue.

93.    With respect to the FDA's investigation and April 12 Warning Letter related to manufacturing failures and violations at Rocky Mount and Clayton, the Form 10-Q stated:

In April 2010, Hospira received a Warning Letter from the FDA in connection with the FDA's inspection of Hospira's pharmaceutical

and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina. In the letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting obligations. The letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar violation cited in the August 2009 Warning Letter. Hospira will be undertaking a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations. *The letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA.* Hospira cannot predict when it will resume shipment of these products. Hospira takes this matter seriously and intends to respond fully, and in a timely manner, to the FDA's Warning Letter.

*Hospira has recognized charges in Costs of goods sold for quality assessment and testing, materials, labor and freight to remediate the matters described above, which have not been significant to date to Hospira. These matters have impacted Hospira's ability to market and sell certain products as noted above, which the impact has not been significant to date to Hospira.*

Hospira cannot, however, give any assurances as to the expected date of resolution of the matters related to the SymbiqTM pump or included in both the Warning Letters. While Hospira continues to work to resolve the remaining matters described above, there can be no assurance that additional costs or penalties will not be incurred, and that additional regulatory actions with respect to Hospira will not occur. Until the violations and other product matters are corrected, Hospira may be subject to additional regulatory action by the FDA, including the withholding of approval of new drug applications, seizure, injunction, and/or civil monetary penalties. *Any such additional FDA actions, or further adverse developments related to the SymbiqTM pump could significantly disrupt our ongoing business and operations and have a material adverse impact on our financial position and operating results. There can be no assurance that the FDA or customers will be satisfied with Hospira's response and corrective actions.*

28

(Emphasis added).

94.    On July 28, 2010, Hospira filed a Form 10-Q with the SEC announcing Hospira's

financial results for the second quarter 2010. The Form 10-Q stated:

> The gross profit increase was primarily the result of higher sales
> volume and favorable product mix including the impact of the U.S.
> oxaliplatin sales and continued higher sales of Precedex™. In
> addition, cost reductions associated with Project Fuel initiatives
> and the impact of foreign exchange contributed to the increase,
> *partly offset by activities directly associated with the FDA's*
> *Warning Letter received in April 2010 and voluntary shipment*
> *holds on certain products, as previously described,* as well as
> penalties for failure to supply customers and increased warranty
> charges on these and other products.

(Emphasis added).

95.    With respect to Hospira's hold on Symbiq shipments, the Form further 10-Q

stated:

> In April 2010, Hospira placed a voluntary hold on all shipments
> of Symbiq™ pumps, a large volume infusion device, to new
> customers. Hospira initiated this hold after it received an
> unexplained increase in customer complaints related to the failure
> of the Symbiq™ pump to alarm at the end of infusion therapy
> under certain use conditions. In June 2010, Hospira notified
> customers on interim steps to be taken by customers to mitigate
> this issue and to avoid the use conditions that can lead to the
> failure of the Symbiq™ pump to alarm at the end of infusion
> therapy. Hospira has not asked customers to return or cease using
> their Symbiq™ pumps. The FDA has classified this voluntary
> action as a Class I recall and Hospira is working with the FDA to
> finalize a comprehensive action plan to address this issue.
> *Hospira cannot predict when it will lift this voluntary hold.*
> *Hospira has recognized charges in Cost of products sold for*
> *quality assessment and testing, materials, and labor to remediate*
> *this matter, which have not been significant to date to Hospira.*

(Emphasis added).

96.    With respect to the FDA's investigation and April 12 Warning letter related to

manufacturing failures and violations at Rocky Mount and Clayton, the Form 10-Q stated:

> In April 2010, Hospira received a Warning Letter from the FDA in connection with the FDA's inspection of Hospira's pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina. In the Warning Letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The Warning Letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting obligations. The Warning Letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar violation cited in the August 2009 Warning Letter related to the AC power cords. The FDA did not believe that Hospira had identified the root cause(s) of the problems and had adequately resolved them. The Warning Letter also questioned whether Hospira's interim plans ensured the quality of products that were manufactured at the facilities while implementing the corrective actions and validation activities. Hospira has begun to undertake a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations.

> Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling the propofol and liposyn products manufactured at the Clayton facility and the fosphenytoin sodium injection products manufactured at the Rocky Mount facility. Hospira is also working with several third party experts to assist with the ongoing activities at both facilities. Hospira has implemented certain interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release. The Warning Letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA. Hospira is working to resume shipment of these products, but cannot predict when such shipments will commence.

> ***During the three months ended June 30, 2010, Hospira recognized pre-tax charges, in Cost of products sold, of $25.8 million for third party oversight and consulting, and penalties for failure to supply product to certain customers under various***

> ***contracts, all directly associated with Hospira's response to the FDA's Warning Letter received in April 2010. These costs include activities associated with the matters cited above for the Rocky Mount and Clayton facilities as well as Hospira's assessment of the status of its quality operations on a holistic basis throughout its global manufacturing facilities. Hospira expects to incur an additional $10 million to $15 million per remaining quarter in 2010 related to these activities.***

(Emphasis added).

97.     On October 26, 2010, Hospira filed a Form 10-Q, announcing its financial results for the third quarter 2010. With respect to the April 12, 2010 Warning Letter Hospira received from the FDA, the Form 10-Q cited the persistent violations and deficiencies identified in the Warning Letter and Hospira's failure to adequately resolve them:

> In April 2010, Hospira received a Warning Letter from the FDA in connection with the FDA's inspection of Hospira's pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina. In the Warning Letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The Warning Letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting obligations. The Warning Letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar violation cited in the August 2009 Warning Letter related to the AC power cords. The FDA did not believe that Hospira had identified the root cause(s) of the problems and had adequately resolved them. The Warning Letter also questioned whether Hospira's interim plans ensured the quality of products that were manufactured at the facilities while implementing the corrective actions and validation activities. Hospira has made significant progress on completing a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations.

98.     On February 16, 2011, Hospira filed its Annual Report for the year 2010 with the SEC on Form 10-K. In addition to reporting that Hospira had been unable to remediate the

violations cited in the April 12 Warning Letter, the Form 10-K reported substantial costs incurred in connection with such unsuccessful remediation efforts, which had offset Hospira's net sales and gross profits:

> In April 2010, Hospira received a Warning Letter from the FDA in connection with the FDA's inspection of Hospira's pharmaceutical and device manufacturing facilities located in Rocky Mount, North Carolina and Clayton, North Carolina. In the Warning Letter, the FDA cites Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The Warning Letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting obligations. The Warning Letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009, and include a similar violation cited in the August 2009 Warning Letter related to the AC power cords. The FDA did not believe that Hospira had identified the root cause(s) of the problems and had adequately resolved them. The Warning Letter also questioned whether Hospira's interim plans ensured the quality of products that were manufactured at the facilities while implementing the corrective actions and validation activities. Hospira has made significant progress on completing a comprehensive review of its manufacturing operations to ensure compliance with applicable regulations.

> \* \* \*

> During 2010, Hospira recognized pre-tax charges, in Cost of products sold, of $54.3 million for third party oversight and consulting, idle facility costs and penalties for failure to supply product to certain customers under various contracts, all directly **associated with Hospira's response to the FDA's Warning Letter received in April 2010. These costs include activities associated with the matters cited above for the Rocky Mount and Clayton facilities as well as Hospira's assessment of the status of its quality operations on a holistic basis throughout its global manufacturing facilities.**

(Emphasis added).

99. In addition, the Form 10-K cited costs incurred by Hospira in connection with the safety concerns and corresponding recall and shipment hold of Symbiq:

*Symbiq<sup>TM</sup> Pumps*

In April 2010, Hospira placed a voluntary hold on all shipments to new customers of Symbiq$^{TM}$, a large volume infusion device. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq$^{TM}$ to alarm at the end of infusion therapy under certain use conditions. In June 2010, Hospira notified customers on interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of the SymbiqTM to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the Symbiq$^{TM}$ infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. Hospira has not asked customers to return or cease using their SymbiqTM pumps. ***Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which have not been significant to date to Hospira.***

(Emphasis added).

100.    As a February 2, 2011 *Zacks Investment Research* article entitled "Hospira Misses; 2011 View Weak" explained, "[f]ourth quarter revenues decreased 6% from the prior-year quarter to $992.1 million. Total revenues were also much below the Zacks Consensus Estimate of $1.04 billion. ***Revenue performance was disappointing due to the voluntary hold of Symbiq Infusion Pump shipments*** and certain non strategic asset divestures." (Emphasis added).

101.    On April 26, 2011, Hospira filed a Form 10-Q with the SEC, announcing Hospira's financial results for the first quarter 2011. In addressing the April 12, 2010 Warning Letter, the Form 10-Q again acknowledged the FDA's findings of violations and deficiencies, and Hospira's inability to remediate the violations cited in the Warning Letter:

In April 2010, Hospira received a Warning Letter from the FDA in connection with the FDA's inspection of Hospira's pharmaceutical and device manufacturing facilities located in Clayton, North Carolina and Rocky Mount, North Carolina. In the Warning Letter, the FDA cited Current Good Manufacturing Practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. *The Warning Letter also asserts other inadequacies, including procedures related to the Quality Control unit, investigations, and medical reporting obligations. The Warning Letter asserts that some of the deficiencies were repeat observations from a prior inspection conducted in April 2009. The FDA did not believe that Hospira had identified the root cause(s) of the problems and had adequately resolved them. The Warning Letter also questioned whether Hospira's interim plans ensured the quality of products that were manufactured at the facilities while implementing the corrective actions and validation activities.*

Hospira has responded to the April 2010 Warning Letter and is working closely with the FDA to conclude these matters. As part of Hospira's response, Hospira took immediate actions to address the FDA's concerns, including recalling certain products manufactured at the Clayton and Rocky Mount facility. Hospira is also working with several third party experts to assist with the ongoing activities at both facilities. Hospira has implemented certain interim controls, including third party oversight, to ensure products manufactured at both facilities meet their specifications prior to release. Hospira has made significant progress on completing a comprehensive review of all its manufacturing operations to ensure compliance with applicable regulations. *The Warning Letter does not restrict production or shipment of Hospira's products from these facilities but Hospira is holding shipment of certain products pending its further investigation and discussions with the FDA.* Hospira resumed shipment of certain products placed on voluntary shipping hold, but cannot predict when all products on voluntary hold will be reintroduced to the market.

(Emphasis added).

102.    The April 26, 2011 Form 10-Q also reported charges recognized by Hospira as a result of its safety concerns and the corresponding suspension of shipment of Symbiq:

*Symbiq$^{TM}$ Infusion Pumps*

> In April 2010, Hospira placed a voluntary hold on all shipments to new customers of Symbiq$^{TM}$, a large volume infusion device. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq$^{TM}$ to alarm at the end of infusion therapy under certain use conditions. In June 2010, Hospira notified customers on interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of the Symbiq$^{TM}$ to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the Symbiq$^{TM}$ infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. Hospira has not asked customers to return or cease using their SymbiqTM pumps. ***Hospira has recognized charges in Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which have not been significant to date to Hospira.***

(Emphasis added).

103. In addition, the Form 10-Q disclosed that the FDA had tentatively scheduled an inspection of the Rocky Mount facility to occur during the second quarter of 2011 as a follow-up to the April 12, 2010 Warning Letter.

104. On April 27, 2011, Hospira received a Form 483 from the FDA, citing 11 different regulatory compliance concerns the FDA observed after inspecting Hospira's Austin, Texas facility between April 4 and April 17, 2011. The Form 483 cited the following 11 observations with respect to quality control, facilities and equipment, production of drug products, packaging and labeling, and laboratory control:

**Quality System**

**OBSERVATION 1**
The quality control unit lacks responsibility to approve and reject all procedures or specifications impacting on the identity, strength, quality, and purity of drug products.

**OBSERVATION 2**
Drug products failing to meet established quality control criteria are not rejected.

**OBSERVATION 3**
Employees engaged in the manufacture, processing, packing, and holding of a drug product lack the training required to perform their assigned functions.

**OBSERVATION 4**
Batch production and control records do not include the results of any investigation made into any unexplained discrepancy, whether or not the batch of drug product had already been distributed.

**Facilities and Equipment System**

**OBSERVATION 5**
Written procedures are not established and followed for the cleaning and maintenance of equipment, including utensils, used in the manufacture, processing, packing or holding of a drug product.

**OBSERVATION 6**
Equipment used in the manufacture, processing, packing or holding of drug products is not of appropriate design to facilitate operations for its intended use.

**OBSERVATION 7**
Appropriate controls are not exercised over computers or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel.

**Production System**

**OBSERVATION 8**
There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess.

**OBSERVATION 9**
Written procedures are not established that describe the examinations to be conducted on appropriate samples of in-process materials of each batch.

**Packaging and Labeling System**

**OBSERVATION 10**
Each lot of drug product containers is not withheld from use until the lot has been sampled, tested, examined, and released by the quality control unit.

**Laboratory Control System**

**OBSERVATION 11**
Procedures designed to prevent microbiological contamination of drug products purporting to be sterile are not.

105. On May 11, Goldman Sachs analysts downgrading Hospira stock from Buy to Neutral, explaining that Hospira's "[u]nderperformance has been driven by quality control challenges and downward revisions in consensus earnings forecasts."

106. On June 17, 2011, Hospira announced that the FDA had conducted a follow-up inspection of its Rocky Mount facility between May 16 and June 17, 2011 and issued Hospira a Form 483 citing additional facility and product quality concerns and areas requiring remediation and improvement. The Form 483 cited the following 18 separate observations, warning that "[t]he observations noted in this Form FDA-483 are not an exhaustive listing of objectionable conditions. Under the law, your firm is responsible for conducting internal self-audits to identify and correct any and all violations of the quality system requirements":

**OBSERVATION 1**
There is no written testing program designed to assess the stability characteristics of drug products.

**OBSERVATION 2**
The responsibilities and procedures applicable to the quality control unit are not fully followed.

37

**OBSERVATION 3**
There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed.

**OBSERVATION 4**
Written records of investigations into unexplained discrepancies and the failure of a batch or any of its components to meet specifications do not always include the conclusions and follow-up.

**OBSERVATION 5**
Deviations from written sampling plans and test procedures are not justified. The firm failed to investigate out of specification (OOS) laboratory results as per SOP QCP.05.002, "Laboratory Investigation Procedure" and the investigations have lacked scientific justification to support the dismissal of OOS results and conclusions of the investigations.

**OBSERVATION 6**
An NDA-Field Alert Report was not submitted within three working days of receipt of information concerning a failure of one or more distributed batches of a drug to meet the specifications established for it in the application.

**OBSERVATION 7**
Investigations of an unexplained discrepancy and a failure of a batch or any of its components to meet any of its specifications did not extend to other drug products that may have been associated with the specific failure or discrepancy.

**OBSERVATION 8**
Control procedures are not established which validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product.

**OBSERVATION 9**
Equipment used in the manufacture, processing, packing or holding of drug products is not of appropriate design and suitably located to facilitate operations for its intended use and cleaning and maintenance.

**OBSERVATION 10**

Buildings used in the manufacture, processing, packing, or holding of a drug product do not have the suitable construction to facilitate cleaning, maintenance, and proper operations.

**OBSERVATION 11**

The separate or defined areas and control systems necessary to prevent contamination or mix-ups are deficient.

**OBSERVATION 12**

Written procedures are not followed for the cleaning and maintenance of equipment, including utensils, used in the manufacture, processing, packing or holding of a drug product.

**OBSERVATION 13**

Employees are not given training in the particular operations they perform as part of their function.

**OBSERVATION 14**

Corrective and preventive action activities and/or results have not been adequately documented.

**OBSERVATION 15**

Process validation activities and results have not been adequately documented.

**OBSERVATION 16**

Design plans that describe or reference the design and development activities and define responsibility for implementation have not been established.

**OBSERVATION 17**

Management with executive responsibility has not reviewed the suitability and effectiveness of the quality system with sufficient frequency.

**OBSERVATION 18**

Procedures for quality audits have not been adequately established.

107. On July 27, 2011, Hospira filed a Form 10-Q with the SEC announcing Hospira's financial results for the second quarter 2011. The Form 10-Q disclosed the following information about charges incurred in connection with Symbiq and the FDA's follow-up inspection at Rocky Mount:

In January 2011, the FDA conducted a follow-up inspection at the Clayton facility to evaluate Hospira's corrective actions in response to items raised in the April 2010 Warning Letter. The FDA did not issue an Inspectional Observation ("Form 483") of any potentially objectionable conditions related to the Clayton inspection. *The FDA conducted a follow-up inspection at the Rocky Mount facility in May 2011. The FDA issued a Form 483 for the Rocky Mount inspection listing their observations related to certain quality systems, facilities, and operating procedures. Hospira has submitted a response to the FDA, and continues to interact and work with the FDA to resolve the matters identified in the Form 483.*

*During 2010, Hospira incurred charges of $54.3 million related to the activities associated with the matters cited above for the Clayton and Rocky Mount facilities as well as Hospira's assessment of the status of its quality operations on a holistic basis throughout its global manufacturing facilities. During 2011, Hospira continued to invest in quality operations throughout its global manufacturing facilities.* However, to remediate the specific matters cited above, charges incurred were not significant during the three and six months ended June 30, 2011.

*Symbiq$^{TM}$ Infusion Pumps*

In April 2010, Hospira placed a voluntary hold on all shipments to new customers of Symbiq$^{TM}$, a large volume infusion device. Hospira initiated this hold after it received an unexplained increase in customer complaints related to the failure of the Symbiq$^{TM}$ to alarm at the end of infusion therapy under certain use conditions. In June 2010, Hospira notified customers on interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of the Symbiq$^{TM}$ to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the Symbiq$^{TM}$ infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. Hospira has not asked customers to return or cease using their Symbiq$^{TM}$ pumps. *Hospira has recognized charges in Cost of*

> *products sold for quality assessment and testing, materials, and*
> *labor to remediate these matters, which have not been significant*
> *to date to Hospira.*

(Emphasis added).

108.    On August 4, 2011, Hospira received another Form 483 from the FDA citing additional facility and product quality concerns and areas requiring remediation and improvement at Rocky Mount, as observed during another follow-up inspection by the FDA between July 15 and August 4, 2011.  That Form 483 observed the following problems that still required remediation by Hospira:

> **OBSERVATION 1**
> There is a failure to thoroughly review the failure of a batch or any
> of its components to meet any of its specifications whether or not
> the batch has been already distributed.
>
> **OBSERVATION 2**
> Laboratory controls do not include the establishment of
> scientifically sound and appropriate test procedures designed to
> assure that drug products conform to appropriate standards of
> identity, strength, quality and purity.
>
> **OBSERVATION 3**
> The responsibilities and procedures applicable to the quality
> control unit are not fully followed.

109.    On September 7, 2011, Hospira filed a Form 8-K with the SEC announcing that it was hosting an "investor day" that day to "provide information about the company's business and strategy" and to "[p]rovide 2016 financial goals."  Attached as an exhibit to the Form 8-K were copies of the slides and presentations used at the investor day sessions.

110.    During the investor presentation, Jim Hardy, Hospira's Senior Vice President of Operations acknowledged that with respect to Hospira's Rocky Mount manufacturing plant:

> … *I believe we got a little lazy.*  I believe that the bar was
> changing, the puck was moving, you pick the analogy, but *we were*
> *kind of skating behind the puck and it was time for us to get*

41

***caught up and it was time for us to take on a new mentality and a different approach.***

Well, what happened in our past I think is pretty well known as we received a Warning Letter for our Rocky [and] Clayton facilities, it happened in 2010. And when that Warning Letter was received we developed a very robust action plan. We kicked off a quality transformation effort across both Rocky [and] Clayton and the rest our pharmaceutical business as well as our MMS platforms. And that quality transformation plan was rolled through operations.

The robust action plans that were developed in Rocky and Clayton were tracked, as [Hospira's Chief Executive Officer Mike Ball] likes to say, here at the Ivory Tower, we were measuring and reporting and had green, yellow and red graphs. But the proof's going to be in the pudding when you come to transformation. And what we saw was a mixed bag of results… ***when we got to the Rocky Mount re-inspection, we were not only disappointed, we were somewhat surprised.*** That same kind of rigor had not stuck in Rocky.

We're fighting a different animal. It's a very complex plant. We're trying to drive remediation at the same time we're trying to drive very robust cost-savings programs. And we found those things competing with each other. ***There was a lack of clear focus in Rocky Mount. And the FDA thought, and we subsequently received, additional Form 483 observations in our most recent audit.***

\* \* \*

We're pulling together our next phase of improvement plans, and we'll be sharing those with the FDA ***over the next few years.***

\* \* \*

The next area is our comprehensive MMS remediation…And we see this as being a ***two to three-year process*** between out pharma remediation at Rocky Mount, as well as our MMC remediation, ***we think this will take us two to three years and be in the neighborhood of $200 million to $250 million.***

(Emphasis added).

111. Further updating the FDA's April 12, 2010 Warning Letter regarding Hospira's

Rocky Mount and Clayton facilities, the investor presentation stated that "[s]ubsequent to the

June 2011 inspection, the FDA completed another inspection in August, which resulted in additional Form 483 observations that identified further areas for remediations/improvement."

112. A September 7, 2011 *Reuters* news article entitled "Hospira sees mid-single digit growth through 2014," commented on the investor day presentation that Hospira's "sales will remain lackluster through 2014, growing in the mid single digits before accelerating into the low teens, executives said on [September 7, 2011]." The news article noted that "[s]peaking at Hospira's investor meeting at its headquarters in suburban Chicago, executives told analysts that will take 18-24 months to fix manufacturing problems at its plants in North Carolina."

113. On October 18, 2011, Hospira filed a press release announcing certain preliminary financial results for the third quarter 2011. Notably, the press release reported that adjusted income from operations and adjusted earnings per share for the quarter were "lower than anticipated primarily due to certain quality actions taken in response to a [FDA] 2010 warning letter and subsequent observations related to the company's manufacturing facility in Rocky Mount, North Carolina, device quality and supply-related issues." The press release elaborated:

> "While recently launched product sales continue to drive top-line growth, ***we were extremely disappointed in the third quarter by developments related to our quality-improvement initiatives that resulted in a significant slowdown of production and an associated impact on our operating performance,***" said F. Michael Ball, chief executive officer. "As I indicated at our Investor Day in early September, addressing these issues is Hospira's top priority, and our organization is committed to full resolution. I remain confident that Hospira will emerge from this process a stronger, more competitive global company that is optimally positioned to serve the needs of our customers and patients, and deliver strong value to our shareholders."

* * *

43

Preliminary adjusted* income from operations for the third quarter of 2011 was $142 million compared to $189 million in the third quarter of 2010. ***The decline is primarily due to charges and costs associated with the quality actions and related inventory losses.*** Preliminary adjusted* diluted earnings per share were $0.66 for the third quarter of 2011.

On a U.S. Generally Accepted Accounting Principles (GAAP) basis, ***the company had a preliminary loss from operations of $85 million in the third quarter of 2011 compared to income from operations of $142 million in the third quarter of 2010.*** The third quarter of 2011 includes a preliminary goodwill impairment charge related to Hospira's European operating unit identified during Hospira's annual impairment test. On a GAAP basis, the company had a preliminary diluted loss per share of $0.54 compared to diluted earnings per share of $0.42 in the prior-year third quarter. Results under GAAP include items as detailed in the schedule attached to this press release.

\* \* \*

2011 Projections

Given the preliminary third-quarter results, Hospira currently estimates that its adjusted* diluted earnings per share for full-year 2011 will range between $2.95 and $3.05 per share, or $1.40 to $1.50 on a GAAP basis. These estimates are preliminary. Hospira will discuss its full-year 2011 projections in further detail when it reports its final third-quarter 2011 results on October 26, 2011.

(Emphasis added).

114.    On this news, shares of Hospira common stock plunged to a daily trading low of $29.03 on October 18, 2011 down 22% from its October 17 closing price of $37.36 per share, on unusually high trading volume of over 21,000,000, a price that is significantly less than the price at which the Plan and its Participants were investing in Hospira common stock during the Class Period.

115.    An October 18, 2011, a *Financial Times* news article entitled "Hospira hit by production disruption" stated that "[m]ore than [$1 billion] was wiped off the market

capitalization of pharmaceutical company Hospira [that day] after the firm said a Food and Drug Administration investigation is affecting output from its main manufacturing plant." The article noted that Hospira's plummet in stock price occurred as news surfaced that "production slow[ed] significantly" at Hospira's Rocky Mount plant.

116. As Gregory Hertz, healthcare analyst at Citibank noted on October 18, 2011, "[t]his raises significant new credibility issues for the management." Goldman Sachs analyst David Roman likewise noted that "[i]t also raises questions about the company's long-term growth." With respect to Hospira's ability to remediate the numerous FDA quality and compliance concerns at Rocky Mount, Gregory Hertz also warned, "[m]y interpretation, having read the correspondence, is that the FDA thinks the ***Rocky Mount plant has reached the end of its usual life***, ***which would have serious long-term consequences for Hospira***." (Emphasis added). Mathew Taylor, a healthcare analyst at Barclays Capital, also cautioned, "[u]ntil there is more clarity around how big this issue is and when we might see a resolution, the share price will stay depressed and may even fall lower."

117. On October 26, 2011, Hospira issued a press release entitled "Hospira Reports Third-Quarter 2011 Results," and filed a corresponding Form 10-Q with the SEC announcing Hospira's financial results for the third quarter 2011. The press release confirmed Hospira's October 18, 2011 press release's preliminary findings that adjusted income from operations and adjusted earnings per share for the quarter were "significantly lower" than expected due to the FDA's 2010 warning letter and subsequent Form 483s related to Hospira's Rocky Mount plant. The press release acknowledged that, "despite the continued contribution of recently launched products to revenue growth, ***our third-quarter results were significantly impacted by developments related to our quality-improvement initiatives***." (Emphasis added).

45

118.    The corresponding Form 10-Q reported that the FDA has continued to raise new quality and operational concerns during its follow-up inspections at Rocky Mount which have caused Hospira to recognize substantial losses and incur substantial charges.  The Form 10-Q acknowledged that such costs and charges were "directly associated" with these quality and production issues at Rocky Mount.  The Form 10-Q further reported that these issues would cause Hospira to incur additional charges in the range of $300-$375 million over the next two to three years related to these Rocky Mount matters.  The Form 10-Q detailed the financial impact of costs and charges incurred by Hospira in connection with its Symbiq and FDA regularoty compliance problems during the Class Period:

> In January 2011, the FDA completed a follow-up inspection at the Clayton facility to evaluate Hospira's corrective actions in response to items raised in the Warning Letter.  The FDA did not issue a Form 483 of any potentially objectionable conditions related to the Clayton inspection.  *The FDA completed a follow-up inspection at the Rocky Mount facility in June 2011, and issued a Form 483 listing observations related to certain quality systems, facilities, and operating procedures.  In August 2011, the FDA completed an additional inspection at the Rocky Mount facility, which resulted in additional Form 483 observations that identified further areas for remediation and improvement.*  Hospira is implementing a comprehensive remediation plan, including obtaining the assistance of third party subject matter experts to help Hospira address the FDA's concerns.  Hospira has implemented certain interim oversight controls, including third party oversight; product assessments; retrospective reviews of laboratory results related to out of specification findings and investigations; and the development and implementation of a comprehensive laboratory action plan.  *Hospira also has implemented significant management changes to the Rocky Mount facility's leadership team.*
>
> During the three and nine months ended September 30, 2010, *Hospira recognized charges, in Cost of products sold, of $15.1 million and $40.9 million, respectively, for third party oversight and consulting, reduced production volume costs and penalties for failure to supply product to certain customers under various contracts, all directly associated with Hospira's response to the*

***FDA's Warning Letter.*** From the inception of these matters through December 31, 2010 Hospira incurred $58.5 million of related charges. During 2011, Hospira continued to invest in quality operations throughout its global manufacturing facilities including the Clayton and Rocky Mount facilities. ***To remediate the specific 2011 matters cited above, during the three and nine months ended September 30, 2011, Hospira recognized charges, in Cost of products sold, of $10.3 million for third party oversight, consulting costs, and costs associated with reduced production volume at the Rocky Mount facility.*** In addition, during the three and nine months ended September 30, 2011, Hospira incurred inventory related charges of $14.0 million at the Rocky Mount facility ***due primarily to remediation actions being implemented and the resulting impact on inventory spoilage, excess and obsolescence.***

## $Symbiq^{TM}$ Infusion Pumps

In April 2010, Hospira placed a voluntary hold on all shipments of $Symbiq^{TM}$ infusion pumps to new customers. Hospira initiated this hold after it received an unexplained increase in customer complaints under certain use conditions related to the failure of $Symbiq^{TM}$ to alarm at the end of infusion therapy. In June 2010, Hospira notified customers of interim steps to be taken by customers to mitigate this issue and to avoid the use conditions that can lead to the failure of $Symbiq^{TM}$ to alarm at the end of infusion therapy. In August 2010, Hospira initiated a set recall related to the issue. Additionally, Hospira notified customers of reports of unrestricted flow when the $Symbiq^{TM}$ infusion set cassette is improperly removed from the pump before the pump's cassette door is fully opened. Hospira cautioned customers to allow the pump's cassette door to fully open before removing the infusion set as the pump may not alarm when the infusion set is improperly removed. The FDA has classified each of these actions as a Class I recall and Hospira is working closely with the FDA to conclude these matters. Hospira has not asked customers to return or cease using their $Symbiq^{TM}$ pumps. Hospira has recognized charges in ***Cost of products sold for quality assessment and testing, materials, and labor to remediate these matters, which were $5.0 million for the three and nine months ended September 30, 2010 and were $6.2 million in aggregate.***

\* \* \*

Financial Related Impact

> For the historical period from the beginning of these matters through the period ended June 30, 2011, ***Hospira had incurred approximately \$90.7 million of charges for these quality and product related matters referenced above.*** In addition, beginning with the three months ended September 30 2011, ***Hospira expects to incur over the next two to three years, aggregate pre-tax charges related to these quality and product related matters in the range of \$300 million to \$375 million***, of which Hospira incurred an aggregate of \$52.4 million in the three months ended September 30, 2011.

(Emphasis added).

119. Moreover, on October 26, 2011, Hospira hosted a conference call to discuss its third quarter 2011 financial results, during which Hospira revealed that the FDA was also examining Hospira's Austin, Texas manufacturing plant and that "the FDA is likely not only just withholding approvals of products coming out of [Rocky Mount] but are most likely doing the same at Austin."

120. A November 11, 2011 *MEDCITY* article entitled "Hospira commits \$375M to make troubled N.C. plant FDA complaint," reported that Hospira would be required to spend up to \$375 million over the next three years to "bring its manufacturing facilities into regulatory compliance, the bulk of it going to a North Carolina plant saddled under heavy regulatory scrutiny for much of the last two years." According to that article, Hospira's Chief Executive Officer, F. Michael Ball, acknowledged that "remediation efforts for Rocky Mount have slowed production and added costs that contributed to the lower-than-expected third-quarter financial results."

121. In addition, a November 11, 2011 *Zacks Equity Research* article entitled "Hospira Still at Underperform," stated that Zacks Investment Research analysts maintained an Underperform rating on Hospira, stating that "[e]arnings were hurt by the slowdown in

production at the company's facility in Rocky Mount, North Carolina." The news article reported:

> ***Rocky Mountain is currently operating at 60-70% of normalized levels and is expected to function at the same pace throughout the remainder of 2011.*** Though the company is aggressively working to address the areas of concern, timeliness of remediation is unclear. Accordingly, management cut its 2011 adjusted earnings guidance to $2.95-$3.05 from $3.90-$4.00 to reflect lower sales and higher costs. ***Following the management action, we also trimmed our revenue and earnings estimates significantly.***
>
> ***Hospira has put shipments of its Symbiq general infusion pump to new customers on hold due to reports of alarm failures in certain conditions.*** Hospira is also facing an issue with its Plum A+ pump regarding an alarm failure. The company continues selling the Plum pump though sales are moderating.
>
> Moreover, customers are delaying purchase of the pump until the corrected pumps are available.
>
> * * *
>
> Though the company is ramping up the field remediation of the Plum devices in use by existing customers and has begun shipping Plum orders to customers, we believe sales will continue to be light until the remediation is fully complete.
>
> ***As the timing of resolution of the matters related to the Symbiq/Plum pumps or the FDA Warning Letter remain clouded, we have an underperform rating on Hospira.***

(Emphasis added).

122. A November 29, 2011 *Bloomberg Businessweek* news article [updated on December 2, 2011] entitled "Hospira May Face Widespread Production Delays," cited RBC Capital Markets LLC analysts as classifying Hospira's production breakdowns as being "widespread" and warned that "[t]he problems may indicate a systemic issue that will have to be rectified long term."

123.    On November 29, 2011, Hospira common stock dropped at a closing price of $28.17 per share, down 9% from the closing price the previous day, and constituting the lowest closing price of Hospria since March 23, 2009.  Remarking on the steep decline in stock price, one RBC analyst, Shibani Malhotra reported that Hospira's manufacturing issues are "far greater than investors realize" spanning across "multiple facilities."

124.    A December 2, 2011 *Bloomberg Businessweek* article entitled "Hospira Proving Drug Takeover Target With FDA Scrutiny: Real M&A" reported that Hospira has fallen 49 percent this year before December 2, 2011, "the steepest drop of any health-care company in the Standard & Poor's 500 Index, as Hospira works to fix quality control problems at its plants after receiving warnings from the [FDA]."  Consequently, "Hospira's 49 percent drop this year had wiped out $4.6 billion in value for shareholders through [December 1, 2011]."  According to data compiled by *Bloomberg*, Hospira traded the week of December 2, 2011 "at a record low of 1.46 times net assets, making it the cheapest generic pharmaceuticals maker in the U.S. greater than $500 million."  Looking forward, the article reported that "[c]onversation with FDA experts indicate 'a consent decree is more likely than not.'"  Such a consent decree "would give the FDA authority to shut down plants and force Hospira to hire a third-party consultant, which could reduce production and earnings."

125.    On January 4, 2012, after a 3.5 week long inspection of Hospira's McPherson, Kansas facility, the FDA issued a Form 483, citing 6 observations relating to the following areas: visual inspection, gowning, component testing, humidity monitoring, air circulation studies, and reserve sample inspection.

126.    On February 7, 2012, a news article entitled "BlackRock's Top Underperforming Sells" reported that "in a recent call the company management said that it has extended its

scheduled shutdown of Rocky Mount plant by a few more weeks. There is no further clarity on the timeliness of the potential resolution of its manufacturing issues. These issues are expected to hamper [Hospira's] production *severely*, *directly impacting its top line growth in 2012*." (Emphasis added). BlackRock analysts further predicted, "I expect [Hospira's] stock to resume its downward trajectory soon."

127. On February 14, 2012, Hospira issued a press release entitled "Hospira Reports Fourth-Quarter and Full-Year 2011 Results – Provides Sales and Earnings Projections for 2012," and filed a corresponding Form 10-K announcing Hospira's financial results for the third quarter and full-year 2011. The press release reported, in pertinent part:

> Adjusted* income from operations decreased 21.8 percent to $111 million in the fourth quarter of 2011, compared to $142 million in the fourth quarter of 2010. ***The decrease primarily reflects the impact of charges and costs associated with certain quality actions and inventory losses.***
>
> * * *
>
> Adjusted* income from operations decreased 14.7 percent to $669 million for the full year of 2011, compared to $784 million for the full year of 2010. ***The decline was a result of certain quality actions and inventory losses, as well as a difficult year-over-year margin contribution comparison***
>
> * * *
>
> 2012 Projections
>
> Hospira expects net sales change for full-year 2012 to be in a range of negative 1 percent to positive 2 percent on a constant-currency basis. The company expects foreign exchange to detract from results by a negative 1 percent, based on current exchange rates.
>
> Adjusted* diluted earnings per share for 2012 are expected to be in the range of $2.00 to $2.30. The decline relative to the adjusted* diluted earnings per share for 2011 ***is mainly due to the expected full-year impact of the company's quality-improvement actions***.

(Emphasis added).

128. The corresponding Form 10-K filed with the SEC that same day reported:

> During 2010 and 2011, Hospira voluntarily shut down certain of its production lines temporarily and slowed the release of products in certain manufacturing facilities as a result of certain quality issues cited in a 2010 FDA warning letter ("Warning Letter") and subsequent interactions with the FDA … ***Such interruptions have adversely impacted, and continue to adversely impact, Hospira's ability to manufacture and sell its products. If Hospira experiences any further interruptions of manufacturing at any of the foregoing facilities, such an interruption could further materially and adversely affect Hospira's ability to manufacture and sell its products.***

(Emphasis added).

129. As a February 14, 2012 *FiercePharma Manufacturing* news article entitled, "Hospira sees dim light at end of plant troubles" reported, Hospira's "[e]xecutives see the light at the end of the tunnel where Hospira's manufacturing stumbles are concerned, but that light appears to be from a 60-watt bulb where a 100-watt is needed."  As that article noted, "the fallout from quality lapses will live with Hospira for some time."

130. On March 23, 2012, Hospira filed its Proxy Statement with the SEC for its 2012 Annual Meeting of Shareholders to be held on May 9, 2012.  In reporting the adverse impact of its Rocky Mount problems on Hospira's financial results, the Proxy Statement stated:

> …***our financial results and operational performance were negatively affected by quality challenges encountered at Hospira's manufacturing facilities, and in particular, our plan in Rocky Mount, North Carolina.***  This facility was subject to a warning letter that was issued by the U.S. Food and Drug Administration ("FDA") in 2010.  In June and August 2011, the FDA issued further observations after re-inspecting the facility, which resulted in Hospira accelerating its remediation activities. These remediation activities disrupted production at the Rocky Mount facility, resulting in slow downs and the temporary suspension of the release of products in the later part of the year. While we believe the actions we have taken, and continue to take, to address the FDA's observations, and to replicate the

> improvements across our manufacturing footprint, will serve Hospira well going forward, ***they had a significant impact on our 2011 financial results and operating performance.***
>
> For 2011, net sales were $4,057 million, adjusted net income was $510 million and free cash flow totaled $144 million, and ***all were below the threshold performance metrics previously established by the [compensation committee].***

(Emphasis added).

131. On May 1, 2012, Hospira issued a press release entitled "Hospira Reports First-Quarter 2012 Results," and filed a corresponding Form 10-Q with the SEC, announcing Hospira's financial results for the first quarter 2012. The press release acknowledged that, "Hospira delivered first-quarter results in line with our expectations, which reflects a difficult year-over-year comparison and the impact of our quality improvement initiatives." The press release reported a decrease of 4% in net sales for the quarter due in part to "the adverse impact to supply of the company's quality-improvement and remediation initiatives." Moreover, adjusted income from operations plummeted 49% for the quarter compared to the first quarter of 2011 due to "the impact of costs associated with certain quality actions and inventory losses."

132. The corresponding Form 10-Q filed with the SEC that same day reported the following with respect to the adverse affects Hospria's FDA regulatory compliance problems have had on Hospira's business and shareholder value:

> In April 2010, Hospira received a Warning Letter from the FDA (the FDA's Warning Letter is publicly available on the FDA's website) in connection with the FDA's inspection of Hospira's pharmaceutical and device manufacturing facilities located in Clayton, North Carolina and Rocky Mount, North Carolina. In the Warning Letter, the FDA cited current good manufacturing practice deficiencies related to particulate in certain emulsion products at the Clayton facility and the failure to adequately validate the processes used to manufacture products at the Rocky Mount facility. The Warning Letter also asserted other inadequacies, including procedures related to the Quality Control

unit, investigations, and medical reporting obligations. Hospira responded to the Warning Letter in 2010, and as part of its response, took immediate actions to address the FDA's concerns, including recalling certain products manufactured at the Clayton and Rocky Mount facilities.

In January 2011, the FDA completed a follow-up inspection at the Clayton facility to evaluate Hospira's corrective actions in response to items raised in the Warning Letter. The FDA did not issue a Form 483 related to this Clayton inspection. The FDA completed a follow-up inspection at the Rocky Mount facility in May 2011, and issued a Form 483 listing observations related to certain quality systems, facilities, and operating procedures. In August 2011, the FDA completed an additional inspection at the Rocky Mount facility, which resulted in additional Form 483 observations that identified further areas for remediation and improvement. Hospira is implementing a comprehensive remediation plan, including obtaining the assistance of third party subject matter experts to help Hospira address the FDA's concerns. Hospira has implemented certain interim oversight controls, including third party oversight; product assessments; retrospective reviews of laboratory results related to out of specification findings and investigations; and the development and implementation of a comprehensive laboratory action plan. ***Hospira also has implemented significant management changes to the Rocky Mount facility's leadership team. These remediation activities caused and continue to cause slowdowns at the Rocky Mount facility beginning in the third quarter of 2011, resulting in drug shortages and costs associated with reduced production volume.***

\* \* \*

During the three months ended March 31, 2012 and 2011, ***Hospira recognized charges specific to the aforementioned matters, in Cost of products sold, of $36.8 million and $0.0 million, respectively, for third party oversight and consulting, costs associated with reduced production volume, higher inventory loss and penalties for failure to supply product to certain customers.***

(Emphasis added).

133.    Notably, unlike in the prior Form 10-Qs, where the May 1, 2012 Form 10-Q discussed the costs incurred by Hospira in connection with its Symbiq recall and FDA compliance issues, it did not state that such costs "have not been significant to date to Hospira"

and did not state that the impact of such issues on Hospira's ability to market and sell certain products "has not been significant to date to Hospira." Indeed, the costs have been substantial and consequently, Hospira's business, growth potential, and shareholder value have suffered significantly.

**DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT
HOSPIRA STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN**

134. As evident by the above mentioned SEC filings, press releases, and annual reports, defendant knew or should have known that Hospira's recall and hold of Symbiq products and its FDA regulatory compliance problems have persisted throughout the Class Period. In turn, defendants knew or should have known that such enduring problems would have a severe adverse impact on the Hospira's financial results, growth potential, and shareholder value, thereby making the Plan's continued investment in Hospira common stock imprudent.

135. Hospira announced its voluntary hold of Symbiq amidst safety concerns in April 2010. As evident by the above SEC filings, press releases, and annual reports, defendants knew or should known that Hospira's recall and shipment hold on Symbiq would significantly disrupt Hospira's ongoing business and operations, would cause Hospira to recognize substantial charges in cost of products sold for quality assessment and testing, materials, and labor to remediate this matter, and would have a materially adverse impact on Hospira's overall business, growth potential, and shareholder value.

136. In addition, Hospira received its Warning Letter for Rocky Mount on April 12, 2010 and have since been issued two subsequent Form 483s by the FDA citing Hospira for regulatory compliance deficiencies that have gone uncorrected since April 12, 2010. Throughout the Class Period, Hospira also received Form 483s for similar uncorrected regulatory compliance deficiencies at its Austin and McPherson facilities. As evident by the above SEC filings, press

releases, and annual reports, defendants knew or should have known that Hospira was not sufficiently correcting the violations observed by the FDA and that these persistent compliance problems would cause Hospira to experience production delays and incur substantial costs which would have a materially adverse impact on Hospira's overall business, growth potential, and shareholder value.

137. Tellingly, in a November 11, 2011 *MEDCITY* news article entitled "Hospira commits $375M to make troubled N.C. plant FDA complaint," Hospira's Chief Executive Officer, F. Michael Ball, was quoted as saying, "[r]eceiving two 483s so close together was a ***clear signal*** that we were not making satisfactory progress to fully comply with the FDA's concerns, and that we needed to ramp up our remediation efforts."  (Emphasis added).  In addition, as a February 7, 2012 news article entitled "BlackRock's Top Underperforming Sells" pointed out, "[Hospira's] market share ***has seen a steady decline ever since it received the warning letter*** to its Clayton and Rocky Mount facilities by [the] FDA."  (Emphasis added).

138. Moreover, throughout the Class Period, analysts cautioned and continue to caution that Hospira's unsuccessful attempts at remediating its quality control problems and bringing its manufacturing facilities into regulatory compliance ***still*** pose considerable risks for Hospira's financial condition, growth potential, and stock price.  In a November 29, 2011 *Bloomberg Businessweek* news article entitled "Hospira May Face Widespread Production Delays," analyst Kevin Kedra of Gabelli & Co. stated what the Plan's fiduciaries knew or should have known during the Class Period; that "[g]eneral quality control standards don't seem to be up to snuff.  Whether there is more trouble to come poses a risk to the stock."

139. Hospira's product shipment, quality control, and manufacturing problems during the Class Period have indeed severely impacted, and will continue to adversely impact Hospira's

ability to manufacture and sell its products. As analysts have recently noted, the timing of a potential resolution of the matters related to Symbiq or the FDA Warning Letter and Form 483s still remains clouded as Hospira continues to experience manufacturing delays and continues to incur hundreds of millions of dollars in costs in connection with those matters. As detailed above, Hospira has conceded that remediation of these quality control and regulatory compliance matters will, at the very least, take several years to complete and will cost Hospira approximately $375 million.

140. Nevertheless, defendants have at all times during the Class Period, invested, and continue to invest, and permit the investment of, Hospira common stock in the Plan and have failed to take *any* action to protect the Plan or its Participants from suffering heavy losses as a result of the Plan's investment in Hospira common stock. In fact, while Hospira experienced escalating quality control and manufacturing problems, defendants encouraged Plan Participants to increase their investments in the Plan regardless of the current market and economic conditions. Indeed, in individual Participant's investment account statements for their Plan investments, Hospira encouraged Participants:

> You realize that even in tough economic times, it's important to try to save as much as you can. ***Regardless of what the market and economy do,*** your Hospira 401(k) Reitrement Savings Plan provides a great opportunity for you to save more for your future – and, now that the company has increased its matching contributions, you have an opportunity to put even more into your 401(k) account.

(Emphasis added).

141. An adequate investigation by Hospira, the Board of Review Defendants, and/or the Compensation Committee Defendants would have revealed to a reasonable fiduciary that

continued heavy investment by the Plan in Hospira common stock throughout the Class Period was imprudent.

142.     Because defendants knew or should have known that Hospira common stock was not a prudent investment option for the Plan, defendants, as fiduciaries of the Plan, had an obligation to protect the Plan and the Plan's Participants from unreasonable and entirely predictable losses incurred as a result of the Plan's heavy investment in Hospira common stock.

143.     A prudent fiduciary acting under similar circumstances would have taken reasonable steps to prevent, or at least, minimize the losses sustained by the Plan and to preserve Participants' retirement savings.

144.     In fact, defendants had available to them several different options for satisfying this duty, including: (i) making appropriate public disclosures as necessary; (ii) divesting the Plan of Hospira common stock, as Plan documents explicitly stated that the Plan was permitted, but *not required*, to hold Hospira common stock as an investment option for Participants; (iii) causing the Plan and the Plan's Participants to invest in alternative investments in the Plan instead of in Hospira common stock; (iv) consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Plan's Participants; and/or (v) resigning as fiduciaries of the Plan to the extent that as a result of their employment by Hospira they could not loyally serve Participants in the Plan in connection with the Plan's acquisition and holding of Hospira stock.

145.     Despite the availability of these and other options, defendants failed to take any action to protect the Plan or the Plan's Participants from lost profits or a diminution of vested benefits as a result of the Plan's investment in Hospira common stock.

## CLAIMS FOR RELIEF UNDER ERISA

### COUNT I
### Failure to Manage the Plan's Assets Prudently and Loyally.
### Breaches of Fiduciary Duties in Violation of ERISA § 404
### (Against the Board of Review Defendants and Compensation Committee Defendants)

146.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

147.    The Board of Review and Compensation Committee Defendants (collectively, the "Prudence Defendants") were responsible for the selection, maintenance, and monitoring of the Plan's investment options, including the option to purchase and hold investment in Hospira common stock.

148.    The Prudence Defendants exercised discretionary authority and/or control over management of the Plan or disposition of the Plan's assets and were, during the Class Period, responsible for ensuring that investment options made available to Participants were prudent. The Prudence Defendants were responsible for ensuring that all investments in Hospira common stock were prudent, and are liable for losses incurred as a result of such investments being imprudent.

149.    The Prudence Defendants knew or should have known that, throughout the Class Period, Hospira was experiencing persistent quality control, manufacturing, and FDA regulatory compliance problems.  Defendants further knew or should have known that such lingering problems would have a severe adverse impact on the Hospira's financial results, growth potential, and shareholder value, thereby making the Plan's continued investment in Hospira common stock imprudent.

150.    Defendants breached their duties to prudently and loyally manage the assets of the Plan.  During the Class Period, upon the exercise of reasonable care, defendants should

reasonably have known that investment in Hospira common stock was imprudent in that any such investment was unsuitable and inappropriate for either Participant contributions or company matching contributions to the Plan. During the Class Period, defendants, in violation of their fiduciary duties, continued to offer Hospira common stock as an investment option for the Plan and to direct and approve the Plan's investment in Hospira common stock, instead of other investments as permitted by the Plan. Despite the imprudence of any investment in Hospira during the Class Period, defendants failed to take adequate steps to prevent the Plan, and indirectly the Participants, from suffering substantial losses as a result of the Plan's continued investment in Hospira common stock.

151.    Defendants also breached their duty of loyalty by failing to administer the Plan with single-minded devotion to the interests of the Plaintiff and the members of the Class, regardless of defendants' own interests.

152.    Defendants further breached their fiduciary duties by failing to disclose that they had failed prudently and loyally to manage the assets of the Plan in the exercise of their discretion with respect to Hospira common stock as an investment option in the Plan.

153.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered damages for which defendants are liable.

## COUNT II

### Failure to Adequately Monitor the Other Fiduciaries of the Plan and to Provide Them With Accurate Information. Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against All Defendants)

154.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

155. By virtue of their fiduciary responsibilities, each of the defendants was bound to monitor the other fiduciaries, and to provide them with information sufficient to perform their duties overseeing the Plan and its investments.

156. Defendants maintained discretionary authority and control with respect to appointing, monitoring, and when necessary, removing members of the Board of Review, which was responsible for selecting, managing, and overseeing the Plan's investments. Accordingly, the defendants breached their duties to monitor and inform by:

> (a) Failing to ensure that the Board of Review, as a monitored fiduciary, had access to knowledge about Hospira's Symbiq and FDA regulatory compliance problems, as alleged above, which made Hospira stock an imprudent retirement investment;
>
> (b) Failing to ensure that the Board of Review appreciated the increased risk posed by the significant investment by rank and file employees in Hospira stock;
>
> (c) Failing to ensure that the members of the Board of Review were prudently and loyally selecting, evaluating, and monitoring the investment options available under the Plan;
>
> (d) Failing to ensure that the Board of Review possessed accurate information about the operations and financial results of Hospira which defendants reasonably should have known the Board of Review needed to make sufficiently informed decisions about selecting, evaluating, monitoring, and when necessary, removing investment alternatives available in the Plan; and
>
> (e) To the extent it was necessary, failing to remove and replace members of the Board of Review for their failure to prudently and loyally select, evaluate, and monitor the investment options available under the Plan.

157. Defendants maintained discretionary authority and control with respect to appointing, monitoring, and when necessary, removing members of the Compensation Committee, which were responsible for managing and administering the Plan and the selecting

and monitoring the Plan's investments. Accordingly, the defendants breached their duties to monitor and inform by:

> (a) Failing to ensure that the Compensation Committee, as a monitored fiduciary, had access to knowledge about Hospira's Symbiq and FDA regulatory compliance problems, as alleged above, which made Hospira stock an imprudent retirement investment;

> (b) Failing to ensure that the Compensation Committee appreciated the increased risk posed by the significant investment by rank and file employees in Hospira stock;

> (c) Failing to ensure that the members of the Compensation Committee were prudently and loyally managing and administering the Plan;

> (d) Failing to disclose to the Compensation Committee accurate information about the operations and financial results of Hospira which defendants reasonably should have known the Compensation Committee needed to make sufficiently informed decisions regarding its selection, evaluation, monitoring, and when necessary, removal of members of the Board of Review;

> (e) Failing to ensure that the Compensation Committee was properly monitoring and evaluating the Board of Review Defendants to ensure that they were prudently and loyally managing and administering the Plan, including prudently and loyally selecting, evaluating, and monitoring the investment options available under the Plan, and when necessary, removing members of the Board of Review; and

> (f) To the extent it was necessary, failing to remove and replace members of the Compensation Committee for their failure to prudently and loyally manage and administer the Plan.

158. As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered damages for which defendants are liable.

## COUNT III

### Failure to Act Exclusively in the Interests of the Plan's Participants
### Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
### (<u>Against All Defendants</u>)

159.    Plaintiff incorporates the allegations contained in the previous paragraphs of this

Complaint as fully set forth herein.

160.    Defendants were duty bound to act with undivided loyalties to the Plan, binding

them to discharge their responsibilities solely in the interest of Participants and for the exclusive

purpose of providing benefits thereto.

161.    Defendants breached their duty of loyalty by:

(a)    Failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transaction which made Hospira stock an unsuitable investment for the Plan;

(b)    Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

(c)    With respect to each of the failures listed in the preceding subparagraphs, defendants failed adequately to inform Plaintiff and members of the Class to prevent general investors, creditors and others from discovering Hospira's Symbiq and FDA compliance problems; and

(d)    By otherwise placing the interests of Hospira and themselves above the interests of the Participants with respect to the Plan's investment in Hospira stock, by among other things, keeping the Plan's assets heavily invested in Hospira common stock when it was imprudent to do so, rather than divesting the Plan's investments in Hospira common stock.

162.    As a direct and proximate result of the breaches of fiduciary duty alleged herein,

the Plan, and indirectly Plaintiff and the members of the Class, suffered damages for which

defendants are liable.

## COUNT IV

### Co-Fiduciary Liability
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (<u>Against All Defendants</u>)

163.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

164.     ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

165.     As alleged herein, the defendants participated in and/or knew about the true nature of Hospira's Symbiq and FDA compliance problems and thus participated in and/or knew about the factual matters pertaining to the imprudence of Hospira stock as an investment for the Participants' retirement assets.

166.     Despite this knowledge, the defendants knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of Hospira stock during the Class Period.  Defendants did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in Hospira stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A).  In addition, these same defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage

64

the Plan's investment in Hospira stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

167.    In addition, the defendants enabled the imprudent asset management decisions of any and all other defendants rendering Hospira stock imprudent, by failing to provide such persons with complete and accurate information regarding Hospira stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by Hospira's manufacturing and regulatory compliance problems, so that these other defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in Hospira stock. In so doing, the defendants breached ERISA § 405(a)(1)(B).

168.    Further, through their failure to properly and effectively monitor their appointees on the Board of Review and Compensation Committee Defendants, and remove those fiduciaries whose performance was inadequate, as alleged above, the defendants enabled these appointed fiduciaries' imprudent management of the Plan's investment in Hospira stock.

169.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's Participants, suffered losses as a result of the Plan's investment in Hospira common stock.

170.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of other members of the Class, prays for judgment as follows:

A.      Declaring this action to be a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that the defendants, together and individually, breached their fiduciary duties under ERISA to Plaintiff, the Plan, and members of the Class;

C.      Compelling the defendants to reimburse the Plan for all losses thereto, resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the assets of the Plan, and to restore to the Plan all profits defendants made through the use of the assets of the Plan, and to restore to the Plan all investment profits that Plaintiff and members of the Class would have made if defendants had fulfilled their fiduciary obligations;

D.      Enjoining the defendants, together and individually, from any further violations of their fiduciary duties under ERISA;

E.      Awarding actual damages in the amount of any losses the Plan suffered to the Plan, to be allocated among the individual accounts of Plaintiff and members of the Class in proportion to the losses of those accounts;

F.      Awarding Plaintiff, the Plan, and members of the Class damages as a result of the wrongs complained of herein, with pre-judgment and post-judgment interest;

G.      Awarding Plaintiff and members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

H.      Awarding Plaintiff and members of the Class such other and further relief as the Court may deem just and proper.

Dated:  June 11, 2012

Plaintiff,

By:*s/Marvin A. Miller*

Marvin A. Miller
MILLER LAW LLC
115 S. LaSalle St., Suite 2910
Chicago, Illinois 60603
Tel:  (312) 332-3400

Robert I. Harwood
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel:  (212) 935-7400

***Attorneys for Plaintiff***